IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 10, 2024 Session

## STATE OF TENNESSEE v. JARED A. SMITH

**Appeal from the Circuit Court for Cheatham County**
**No. 2020-CR-18431        Suzanne M. Lockert-Mash, Judge**

_____

### No. M2024-00062-CCA-R3-CD

_____

Following a jury trial, a Cheatham County jury convicted Defendant, Jared A. Smith, of three counts of Rape of a Child, four counts of Aggravated Sexual Battery, and three counts of Incest, for which he received a total effective sentence of seventy-eight years' incarceration. On appeal, Defendant contends that: (1) the trial court erred by limiting his cross-examination of a police witness; (2) the State's election of offenses was "vague, ambiguous and unsupported by the evidence," in violation of his right to a unanimous jury verdict; and (3) the trial court erred by declining to instruct the jury on generic evidence. Following a thorough review of the record and applicable law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Mark C. Scruggs, Nashville, Tennessee, for the appellant, Jared A. Smith.

Herbert H. Slatery III, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Ray Crouch, Jr., District Attorney General; Margaret F. Sagi and David W. Wyatt (at trial), and Joseph Lee Willoughby (at motion for new trial hearing), Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural Background

This case arises from Defendant's sexually abusing his stepdaughter ("the victim"[1]) when she was between nine and twelve years old. The November 2017 term of the Cheatham County Grand Jury issued an indictment charging Defendant for the following offenses against the victim, all of which were alleged to have occurred between March 4, 2012, and March 3, 2016: four counts of Rape of a Child, a Class A felony (Counts 1-4); three counts of Aggravated Sexual Battery against a child under age thirteen, a Class B felony (Counts 5-7); and four counts of Incest, a Class C felony (Counts 8-11). *See* Tenn. Code Ann. §§ 39-13-501, -13-504, -13-522, -15-302. Defendant was also charged in Count 12 with Sexual Exploitation of a Minor occurring on March 3, 2017; after a pretrial hearing, the trial court granted Defendant's motion to sever relative to Count 12, and he proceeded to trial on the remaining counts.

At trial, the victim's mother testified that the victim, who was born in March 2003, was her only child from a previous marriage and that she and the victim's father divorced in 2004. She met Defendant through a friend when they went to a bar at which Defendant worked, and they began texting one another. They married in October 2010, when the victim was seven years old, and had a child, T.S., in August 2012. The victim's mother, Defendant, and the children moved to the house next door to her parents. She began an electrical engineering job for which she often traveled out of state. She stated that her parents initially watched the victim and, later, T.S. when the victim's mother had work trips. She said that Defendant sometimes took care of the children when she was gone for one or two days. When the victim's mother was not traveling, she had a commute of between forty-five and ninety minutes one way; she later transitioned to a job that was one hour away from home. She estimated that she usually arrived home in the evenings around 6:00 p.m. During this time, Defendant worked for two IT firms before joining an "IT group that supports the TennCare Group[.]" She noted that Defendant could work from home and that their home office had "tons of computers," including touch-screen computers.

The victim's mother quit work in March 2015, but she took a job teaching at a nearby high school in August 2015, when the victim was twelve years old. They transferred the victim from Catholic school to public school partway through her sixth grade year.

---

[1] Although the victim was an adult at the time of trial, it is the policy of this court to protect the privacy of victims of sexual offenses and minors by omitting their names. Similarly, we will omit the name of the victim's mother.

The victim's mother testified that she decided to pursue a master's degree while working toward her teaching certification. On Tuesdays and Thursdays, she attended classes after work and would arrive home between 9:00 and 10:30 p.m. She stated that Defendant would often pick up the children from school on these occasions. The victim's mother testified that she ran half marathons regularly and that, many times, she trained or ran on Saturday mornings.

The victim's mother testified that, when the victim was twelve or thirteen years old, they bought an old pickup truck for Defendant and the victim to repair together as a "father/daughter project" so that the victim could learn about cars and how to fix them. The victim's mother stated that "they would have days where it was just the two of them working on the truck together."

The victim's mother testified that, when she was away on a work trip, Defendant suggested that they do a "sexual video chat." Although the victim's mother was reluctant, she "didn't want another failed marriage" and shared sexual videos with Defendant. She noted that she deleted the videos from her cell phone immediately because she was embarrassed.

The victim's mother testified that the victim attended public school until the spring semester of tenth grade in 2018, when she began attending a residential school for children who were "severely depressed" and whose parents "can't handle the[m] . . . anymore[.]" The victim's mother stated that the victim completed the program and was attending a private school for her senior year.

The victim's mother testified that Defendant left the marital residence from September 8, 2015, until Christmas 2015 or January 2016, and that he left permanently in October 2016. She noted that Defendant would commonly leave for between one and three days after they argued and that she would not know where he was. Defendant filed for divorce in April or May 2017.

The victim's mother testified that she noticed a change in the victim's behavior when she was in fifth grade. The victim's mother recalled a day when the victim drew on the inside of her car door with crayon, which upset the victim's mother. She stated that Defendant was present and that the victim's mother was "distraught" and asked the victim, "[W]hat's wrong with you? Why would you draw on the car?" The victim's mother said that the victim was "very upset" and did not have an answer. She noted that T.S. had just been born and that she had attributed the victim's behavior to "act[ing] out." The victim's mother said that the victim continued doing "little crazy, inconsequential stuff that was completely out of character for her."

The victim's mother testified that, when she began teaching and working toward her master's degree, on two or three occasions she came home and saw Defendant and the victim "lengthwise on the couch together" in the same direction, and the victim's "back would be backed up to [Defendant's] front" and he would have his arm wrapped around her "middle." The victim's mother stated that it was "very intimate-looking" and a "discomforting scene[.]" The victim's mother said that she told Defendant it was inappropriate and that she told the victim that they "cannot lay that way together." The victim's mother testified that, after these incidents, she "just stopped sleeping" and that she "had that feeling that something was wrong[.]" She stated that Defendant would habitually get up in the middle of the night and that she could not find him in the house.

The victim's mother testified that, on March 3, 2017, she was called to the middle school principal's office, where she spoke to the principal, a school counselor, and then-Detective Jeffrey Landis[2] with the Cheatham County Sheriff's Office. Afterward, the victim's mother drove the victim to the Children's Advocacy Center ("CAC") in Charlotte.

The victim's mother testified that, the following week, she took the victim to the "Our Kids" Clinic in Nashville for a physical examination. She said that they visited a Department of Children's Services ("DCS") facility several times. The victim's mother stated that the victim received a Gardasil vaccination series against HPV when she was eleven years old.

On cross-examination, the victim's mother testified that the victim participated in Catholic confession and that the Catholic school had a counselor, but that she did not know about which topics the counselor spoke with the children.

The victim's mother testified that the victim had a boyfriend, R.Y., in 2016 and early 2017; they were classmates, although R.Y. was one year older than the victim. The relationship lasted for about one year. The victim's mother did not approve of the victim's having a boyfriend in eighth grade because she considered her too young to have a relationship. The victim's mother stated that Defendant was also "very adamant that they not have a relationship[.]"

The victim's mother testified that, after the October 2016 separation, the victim's maternal grandfather invited Defendant to live in the basement apartment at the victim's mother's parents' home. The victim's mother stated that Defendant continued to have contact with the victim and T.S. To the victim's mother's recollection, the victim and T.S. always went to visit Defendant's apartment together. The victim's mother testified that, after Defendant left the marital residence, the victim was "very adamant that she did not

---

[2] Mr. Landis was retired at the time of trial.

want to go spend time with him." She noted that, when she told the victim that T.S. needed to see Defendant, the victim would respond, "[W]ell, I'll go down there. If [T.S.] goes down there, I need to go down there."

The victim's mother testified that, at the time of the victim's medical examination at Our Kids, she wanted the victim to be tested for sexually transmitted infections ("STIs") so that any infections could be addressed immediately. The victim's mother said that she suspected that Defendant had human papillomavirus ("HPV") and that she had precancerous cervical cells removed in 2011. She stated that, to her knowledge, the victim did not test positive for any STIs.

The victim testified that, at the time of trial, she was eighteen years old. The victim stated that, after Defendant and the victim's mother married, things were "pretty good"; she stated that the family lived in a townhome with their dogs and that she was "pretty happy."

The victim testified that she would go to car shows with Defendant and that they had an old truck that they planned to repair so that the victim could drive it when she turned sixteen. She said that the truck project lasted a couple of years and that they did not finish it.

The victim testified that her mother took her to church and raised her "to be respectful to other people, especially adults." She explained that, if an adult asked her to do something, she did it. The victim agreed that her mother "instill[ed] in [her] the need to respect [Defendant]" and that Defendant had the same parental authority as her mother in the household. The victim agreed that she obeyed Defendant's instructions.

The victim testified that, when they moved to the house next door to her grandparents, "things just got rough" and that her mother and Defendant yelled and argued often. She stated that, "[i]f it was bad enough [Defendant] would leave and go somewhere for days."

The victim testified that, after Defendant left the marital home for the final time, he eventually began staying with the victim's grandparents because her grandparents wanted her mother and Defendant to "work things out," although the victim did not believe they would reconcile. The victim testified that she did not talk to or see Defendant often and that she considered their relationship to be over. The victim stated that her mother was "still pretty strict, and stressed, and on edge at the time," that her mother yelled a lot, and that the victim got into trouble at home.

The victim testified that, on March 3, 2017, she was in eighth grade. The victim said that she got into trouble that day for "hanging out" with R.Y. The victim stated that she spoke to her guidance counselor, that she was "overwhelmed and freaking out" because she had never gotten into trouble at school before, and that she knew her mother would be upset.

The victim testified that she talked to the guidance counselor and that she was "just kind of babbling" or engaging in "word vomit," during which she would speak aloud without realizing what she had said. The victim stated that she disclosed to the counselor that Defendant had been sexually abusing her. The victim said that she did not ever intend to tell anyone about the abuse because "nobody needed to know, especially not [her] family," and that "[f]or the longest time [she] didn't know what to make of it all." She noted that she felt she "had to protect [her] family from it." The victim stated that she was taught what to do if "something like this ever happened" but explained that, by the time she realized something was wrong and she should tell someone, she felt it was "too late to do anything that would seem to do any good." The victim noted that her mother was "dealing with possibly getting a divorce," that the situation placed pressure on her grandparents, and that Defendant was T.S.'s father. The victim stated that her mother took her to the CAC, where they put the victim in a room with a camera and a therapy dog and asked her about what had happened with Defendant.

The victim testified that, when her mother was not home, she was left with Defendant about half of the time. The victim stated that the first inappropriate incident with Defendant occurred during the summer when she was ten years old. She said that she was home alone with Defendant when her mother was on a work trip. The victim stated that Defendant took off all of his clothes and asked her to remove hers; she noted that it felt like she had no choice. She said that "[i]t was all very weird" and that Defendant brought up the topic "out of nowhere." The victim stated that, although she did not recall the exact sequence of events, Defendant took her into his office and used a "special internet browser that he said people couldn't see what he was looking up" to show the victim photographs and videos of "girls that didn't have their clothes on either, but . . . they weren't women, if that makes sense." The videos depicted the girls masturbating, and Defendant asked the victim to perform the actions in the videos.

The victim testified that, at one point during the same incident, Defendant had them take a bath together and wash each other's bodies, including their genitals, with a bar of soap. The victim did not remember if Defendant had an erection and noted that she did not know what an erection was at the time. The victim recalled that, on this day, he had her sit on his lap and lie down on the office floor and that he touched her chest, buttocks, and vagina. She stated that Defendant also masturbated and inserted his penis into her anus.

The victim said that the penetration was "weird and painful." The victim thought that Defendant only penetrated her anally once, but she could not say with certainty.

The victim testified that the sexual abuse continued for two or three years. The following exchange occurred:

Q. Is this the only time something like this happened?

A. No.

Q. How long did this go on?

A. Couple of years.

Q. Any idea of how many years?

A. Probably two or three.

Q. Do you have specific recollections of other times that things like this happened?

A. A couple.

Q. Let's talk about those. What do you remember?

A. I remember him having me put his penis in my mouth. I remember him putting his mouth on my vagina, or my chest, or him sticking his fingers in my vagina.

Q. On any of these occasions when these acts occurred, do you remember where you were?

A. Sometimes we were in my room. Sometimes we were in his room. Sometimes we were in the office or the living room.

Q. Where did it occur mostly?

A. I'm not sure.

Q. Do you have any idea how many times he placed his fingers inside of your vagina?

A. No.

Q. Can you explain to us why you can't tell us that information?

A. Because I hate thinking about it. These memories are different than other memories . . . . Stuff like this is heavy and dark, and it takes over my head. It takes over my day, makes it hard to do stuff, to think. So I try really hard not to remember.

Q. Likewise, do you have any idea how many times he penetrated you anally with his penis?

A. I would say it was probably one, but I couldn't tell you for sure.

Q. How many times do you think you were required to perform oral sex on him?

A. All I could say is multiple. I don't know how many times.

Q. The same with, can you recall how many times he would've performed oral sex on you?

A. No.

Q. Any idea how many times he touched your breasts?

A. No.

Q. How many times he would've touched your genitals without penetrating your vagina?

A. No.

Q. Was there any way you can remember how many times you were required to touch his penis with your hand?

A. No.

The victim identified a photograph of the touchscreen computer on which Defendant showed her pornography. She stated that, on one occasion, Defendant showed the victim a video of her mother's masturbating ("the masturbation video"), which was stored on a

password-protected application on his cell phone; Defendant told the victim that her mother sent him the masturbation video. The victim recalled that she and Defendant were nude on this occasion and that they were in his home office. The victim testified that T.S. was sometimes home during these incidents, although she was not in the same room.

The victim testified that Defendant told her that she could not tell anybody about the incidents and that he was "just so serious." Although the victim stated that Defendant did not threaten her, she said that he told her the consequences of her telling anyone would be "bad." The victim did not remember when the last incident occurred, although she said that nothing happened "after he left for the first time[.]"

The victim testified that, after she disclosed the abuse, "things just kept getting worse," that she was depressed and was admitted to a mental hospital after threatening to commit suicide, that her mother kicked her out, and that she lived with her grandparents before being sent to a boarding school. The victim stated that she had "started getting [her] act together," although she "hated [her]self" and "couldn't see past it for a really long time."

The victim denied that she hated Defendant when he and her mother divorced or that she tried to break up their marriage. The victim noted that she "didn't want him to touch [her] anymore" but that she was not focused on that because Defendant was absent by that point. The victim stated that she did not want to be at court testifying.

On cross-examination, the victim testified that the abuse did not affect her school grades; she noted that she was "just lucky to be a smart kid." She acknowledged that, before March 3, 2017, she had not disclosed the abuse to her mother, her father, or any school personnel. The victim stated that she visited her father for a week at a time, and she agreed that there was nothing to prevent her from disclosing the abuse. When asked whether she could have asked to live with her father "if it was so bad" at home, the victim stated that she "couldn't do that to [her] mom" and that it would have hurt her mother if she left. She noted that she and her father "didn't talk about anything that was intense[.]"

The victim testified that she and R.Y. texted one another during the summer of 2016 but that they were not in a relationship at that point. She stated that, although her mother and Defendant forbade her from communicating with or seeing R.Y., she disobeyed them. She explained that she "wasn't rebellious, but . . . when it came to relationships and stuff like that, . . . . I would do stuff like that ever since the first incident happened with [Defendant]. I . . . didn't pay as much attention to authority." The victim stated relative to Defendant's status as an authority figure that the abuse "was scary. It wouldn't matter if he's an authority figure. It was scary."

The victim initially denied that she had "sexual relations" with R.Y. After reviewing a transcript of her testimony at a prior court hearing, the victim acknowledged her previous statement that she and R.Y. had sexual intercourse; she explained that she had "blocked out a lot of [her] eighth grade year." The victim stated that she recalled talking to people involved in her March 17, 2017 medical examination at Our Kids, and she said that her memory on that day was "[p]robably" better than it was at the time of trial.

The victim testified that, in the guidance counselor's office, she knew that she would be in trouble because she was doing "exactly what [she] had been . . . forbidden" to do. The victim disagreed that, by disclosing Defendant's abuse, "the situation with [R.Y.] just sort of disappeared[.]" She noted, "It definitely didn't."

On redirect examination, the victim testified that she was not denying having had sexual relations with R.Y.; however, she did not remember it happening. The victim denied ever telling anyone that the incidents involving Defendant did not occur. The victim said that she gained her knowledge of sexual matters from Defendant. The victim denied talking about the abuse to get out of trouble, and she stated that she never wanted the abuse to "come out."

On recross-examination, the victim testified that "a little bit after" Defendant began abusing her, she was inappropriately touched by a male cousin in Arkansas who was ten years older than the victim.

Former Cheatham County Sheriff's Detective Landis testified that he was called to the victim's school on March 3, 2017, "because a child was caught doing something in the school there, something sexually or something." Mr. Landis noted that he had little independent recollection of the case. Mr. Landis stated that he interviewed the victim and the victim's mother at the school and went to the CAC with them for the victim's forensic interview. That evening, Mr. Landis and DCS employee Eric Bicaba[3] interviewed Defendant at his residence in the victim's grandparents' basement.

An audio recording of the interview was entered as exhibit and played for the jury. In the recording, Mr. Landis asked Defendant if he knew why they were there, and Defendant said that his therapist had informed him that the victim had accused Defendant of being "inappropriate or something of that nature." Mr. Landis explained that the victim had been interviewed by the CAC and that he wanted to obtain a written statement from Defendant. Mr. Landis stated that, although Defendant was not under arrest, he wanted to

---

[3] The trial transcript spells Mr. Bicaba's surname phonetically as "Decabo." Trial exhibits reflect that the correct spelling is Bicaba.

inform Defendant of his *Miranda* rights before Defendant gave a statement because it would be part of the court record.

Defendant signed the acknowledgement of rights form and told Mr. Landis that he thought that he and the victim got along "pretty well." Defendant stated that, since he separated from the victim's mother, the victim had been "distancing herself" and "engaging herself in activities." Defendant stated that he had asked unspecified people if the victim was okay and whether they needed to talk and that the people had told him the victim was "just hitting that teenage hormonal stage[.]" Defendant said that he had known the victim since she was five or six years old.

Defendant said that he would assist Mr. Landis however he could and would look at dates and text messages to prove his location. Defendant stated that he did not and would not touch the victim. When asked if he had ever taken a bath with the victim, Defendant said that, on one occasion when the victim was between six and seven years old, she needed a bath before the victim's mother returned home. Defendant stated that he tried to push the victim into the tub, that he pulled off the victim's shirt, and that he ultimately placed her in the shower clothed. He denied having gotten into the bathtub with the victim.

Defendant noted that he had taken a bath with T.S. twice when she was about eighteen months old. He added that he had the victim's mother bathe T.S. "so nothing gets said." Defendant stated that he once spanked the victim's bare bottom and that the victim's mother "had to comfort us both" because "it nearly tore [Defendant] up." When Mr. Landis repeated that there had been allegations, Defendant stated that he "may have looked at a couple of nudist websites." Defendant added that perhaps the victim was afraid of their reaction to her being with R.Y. after they told her to avoid him. Defendant denied touching the victim's genitalia, breasts, or buttocks, touching the victim's buttocks with his penis, performing oral sex on her, or having her perform oral sex on him.

Defendant stated that he worked from 7:30 a.m. until 4:30 p.m. When asked what could be motivating the victim's allegations, Defendant responded that he had "no idea" and theorized that the victim did not want him to get back together with the victim's mother. Defendant stated that they tried not to argue in front of the children and that one of their primary problems was that he would go to the garage and "cool down," whereas the victim's mother wanted to resolve the issue. He denied that the arguments ever became physical. Defendant stated that it sometimes took two or three days for them to cool down.

In response to Mr. Landis' observing that Defendant appeared to be very calm, Defendant stated that he had "a few hours to come to grips with" the allegations and that he had been reading about what happens when a person was accused of sexual abuse.

Mr. Landis asked Defendant to provide a written statement. He instructed Defendant to write down the victim's allegations—that Defendant "gave" the victim anal sex, that oral sex had been given and received, and that Defendant bathed with the victim three years previously "and that's where it started." Mr. Landis stated, "Basically write on there that you deny these allegations, and be specific of the allegations that you're saying." He continued, "In your statement, once you get done with that part, make sure that you put in there, 'I did not show any porn to [the victim], period, whatsoever, on any computer, or any cell phone, or whatever,' ok?"

Mr. Landis then told Defendant that the victim had reported Defendant had shown her the masturbation video on his cell phone and that the victim's mother had confirmed that she had sent Defendant such a video. Defendant said that, although he had the masturbation video on his phone, he did not show it to the victim and that he had "no clue" how the victim knew about it. Defendant noted that he "wipe[d]" old cell phones and that they should not have had the masturbation video stored on them. Defendant stated that he wished he could help Mr. Landis but that he had no idea how the victim saw the masturbation video. He stated that he was "damn careful" about moving the masturbation video to new devices because he did not want the video to "get out." Defendant said that he had deleted the masturbation video from his text messages and moved it to a protected folder. Defendant maintained that he did not show the victim the masturbation video or do "any of this."

After continued questioning, Defendant stated that, four months before his separation, the house was "hot as hell" and that it was the first time he walked around the house without wearing a shirt. He stated that he was always "getting on" the victim to wear more clothing. Defendant repeated that he did not do anything and that he wanted to know "how the hell" the victim knew about the masturbation video. Defendant stated that he only played the masturbation video when "they've all been gone." When told that the victim had stated that Defendant had shown her a family portrait of "nudists" on a website, Defendant denied having done so. Defendant stated that he had known the victim since she was five years old and that he did not think of her "that way."

Jill Howlett testified that she was a social worker at the Our Kids Clinic in Nashville. She identified the victim's medical report ("the Our Kids report"), which reflected that the victim was seen on the morning of March 17, 2017. Ms. Howlett noted that the social worker and nurse practitioner who attended to the victim were not available to testify.

The Our Kids report was received as an exhibit[4] and reflected that the victim's mother reported that the victim told a school counselor that Defendant had been sexually

---

[4] Portions of the Our Kids report were redacted.

abusing her since she was ten years old. The victim's mother said that the victim reported "oral" contact, "penile-anal penetration," and digital vaginal penetration, as well as exposure to pornography, including a video of "sexting" exchanged between the victim's mother and Defendant. The victim's mother thought the last incident of sexual contact could have been in the summer of 2017.

The Our Kids report also reflected that, although the victim's mother said that no prior concerns existed of the victim's having been sexually abused, "there was always something that bothered her about the relationship between [the victim] and [Defendant] and stated she could never figure out what it was that bothered her." The victim's mother mentioned the incident in which she found Defendant and the victim lying together on the couch, as well as her speaking to both of them and "ask[ing] for some boundaries."

The Our Kids report reflected the following regarding the victim's interview:

When asked about the allegations, [the victim] appeared to become nervous and fidgeted in her chair; she took some time before answering. [The victim] then said, "I was raped by my step-dad." When asked what she meant by "rape," [the victim] said, "He would touch me and do things to me that I didn't want to do." When asked about the things he would do, [the victim] fidgeted in her chair and looked down at the ground. She did not answer. [The victim] became teary eyed . . . .

When asked if anyone ever touched her vagina, [the victim] stated her step-dad did. When asked what part of his body touched her vagina, [the victim] said: "His hands and mouth did." When asked if his hands touched her on top of the clothes or on the skin, she stated she was touched on her skin and on top of her clothes. When asked if it felt like his hands touched her on the inside or the outside of her vagina, she stated it was on the "inside." When asked if she felt any pain, she said, "A little bit." When asked where she felt the pain, she said, "Like . . . right around the entrance." When asked if his hands touched her one time or more than one time, she described it happening more than one time. When asked if he touched her with his mouth one time or more than one time, she stated that it happened "more than one time." When asked if she remembers how old she was when he first touched her vagina, [the victim] said, "9 . . . I think." When asked if she remembers the last time he touched her vagina, she said, "I was 13." When asked if he touched her vagina with any other part of his body, [the victim] looked down at the ground and said, "Um . . . I don't think so."

- 13 -

When asked if anyone ever touched her butt, [the victim] nodded her head yes. When asked who touched her butt, [the victim] said, "[Defendant]." When asked what part of his body touched her butt, [the victim] fidgeted in her chair, looked down at the ground, and took some time before answering. [The victim] then said, "Um . . . his penis." When asked if he touched her on her clothes or on the skin, she said it was on her "skin." When asked if it felt like he touched her on the inside or the outside of her butt, she said it was on the "inside." When asked if she felt any pain, she said, "A little bit." When asked if she saw any blood, she shook her head no. When asked if that happened one time or more than one time, she stated that it happened "one time." When asked if she remembers how [old] she was [when] he touched her, [she] stated she was "9 years old." When asked if any other part of his body touched her butt, she shook her head no.

When asked if anyone ever touched her boobs, she said "[Defendant]." When asked what part of his body touched her boobs, she stated he touched her with his "hands" and his "mouth." She stated that both his mouth and hands touched her on her "skin" and that it occurred "multiple times." She stated she was about "9" when he first touched her boobs and "13" when he last touched her boobs.

When asked if she had to touch him in any way, [the victim] looked down at the ground and nodded her head yes. [The victim] stated she touched his "penis" with her "mouth" and her "hands." When asked if she ever saw anything coming out of his penis, she said "yes." When asked what she saw, [the victim] stated that she saw "semen." When asked where the semen went, [the victim] said, "Not anywhere near me." She then said, "I think he caught it in a towel or something." She stated her mouth touched his penis one time and that she was 9 years old when it happened. She stated her hands touched his penis "multiple times" and that it occurred from the ages 9 to 13.

At that time, when asked if anyone else had ever touched her private parts, the victim responded negatively. The victim reported being sexually active with one of her peers; she described penile-vaginal penetration and stated that the contact had last occurred three weeks ago.

The Our Kids report noted that the victim's mother requested STI testing, that the victim's mother had "genital HPV," of which she became aware six years previously, and the victim's mother had seen "warty lesions" on Defendant's penis "as recently as 13 months ago."

- 14 -

The Our Kids report stated that the victim's genital exam revealed "a non-acute hymenal transection which is diagnostic of previous penetrating trauma." The victim's anal examination was "without acute or chronic signs of trauma."

After the close of the State's evidence, Defendant testified that he was thirty-five years old and that he worked for a technology company, for which he "administer[ed] a data center" that developed applications to process TennCare claims. He stated that he was still married to the victim's mother and that he had not seen T.S. since three weeks after the victim reported the abuse.

Defendant testified that, although the victim's mother was "more uptight" than him, things went well between them while they dated. He stated that his relationship with the victim was "really good" and that he "became a father figure in her life." Defendant said, though, that "the dynamics changed right at the wedding," that the victim's mother "flipped like a switch," and that "[s]he almost was bipolar." Defendant stated that he "was never good enough," that "[e]verything [he] did was not up to her par," and that "every little detail in life was wrong." Defendant acknowledged that the victim's mother was older than him. He disagreed that their conflicts arose from the division of labor in the home, and he stated that the main issue was "control."

Defendant said that, after he and the victim's mother married in 2010, they "flip[ped]" the victim's mother's townhouse and moved to the house beside the victim's maternal grandparents' property. He stated that, in 2012, he worked until midnight or 2:00 a.m. and returned to the new house to address various home maintenance problems. He noted that the victim's mother was taking care of T.S. at the time.

When asked to describe an argument he and the victim's mother had, Defendant testified that the victim's mother constantly complained that he needed to spend more time with the family; however, he worked on weekdays until 4:30 p.m., he was responsible for maintaining their "five acres of grass," which took all of Saturday, and Sundays consisted of going to church and visiting the victim's maternal grandparents. Defendant averred that he tried not to raise his voice during arguments and that he "was a de-escalator" who left to sleep in his car and allow the argument to cool down. Defendant stated that the victim "absolutely" heard the arguments. Defendant denied that the arguing became worse after T.S. was born.

Defendant testified that the victim was a good student and that she exhibited "typical teenage behaviors" such as saying things she later regretted. Defendant stated that the victim's mother was the disciplinarian in the household. Defendant said that he helped the victim learn about how computers were built and how they worked. He stated that the victim had her own laptop and that the family had a "spare laptop," "the touchscreen," and

a "Plex server." The victim, Defendant, and the victim's mother had smartphones; he noted that they all knew one another's passcodes. Defendant stated that the victim's mother and the victim sometimes used his debit card when they were out together.

Defendant testified that he slept under his desk at work during a three-day period when he left the home after an argument and that he stayed with his brother or the victim's maternal grandparents during "longer stints[.]" Defendant averred that they attended marital counseling three times with different therapists but that the victim's mother would stop attending when "they would start to take [Defendant's] side on the arguments."

Defendant testified that he lived with his brother for one month after he separated from the victim's mother in October 2016, until the victim's mother fought with his sister-in-law and "demand[ed] that [Defendant] get out of there." Defendant moved into the victim's maternal grandparents' basement apartment at her request. Defendant stated that the victim's mother found another marriage counselor and that they attended weekly sessions together. Defendant said that T.S. and the victim sometimes played in his basement apartment when they visited the victim's maternal grandparents. Defendant denied that the victim's mother ever had complaints about his conduct with either child. Defendant testified that, as of March 2017, he and the victim's mother were spending about one hour together daily at their counselor's request.

Defendant testified that the victim "started wanting to disappear with her friends" at school events and that they learned she was dating R.Y. Defendant said that the victim's mother was "adamant" that, if the victim had a cell phone, they should install monitoring software on it to be able to see to whom the victim was talking and "lock it down." Defendant explained that both he and the victim's mother had "a link" to monitor the victim's cell phone. Defendant stated that, in the fall of 2015 or 2016, he began receiving alerts that someone was sending messages containing curse words to the victim. Defendant and the victim's mother learned that the sender was R.Y., and the victim's mother told the victim that she was losing her telephone privileges and that she was not to see R.Y. Defendant said that the victim "stormed off and went to her room." Defendant denied that the victim's dating R.Y. scared him, but he noted that he believed sixth or seventh grade was too young to be dating. Defendant noted that the victim eventually earned back her phone.

Defendant testified that, in 2016, "somehow it slipped out" that the victim was dating R.Y. and texting him. He explained that the victim had labeled R.Y.'s new telephone number with his given name, rather than the nickname by which Defendant and the victim's mother had known him. Defendant stated that he and the victim's mother got "really irate," that the victim and the victim's mother cried, and that they took away the

victim's phone for two months.  Defendant said that the victim's mother "removed" him from all parenting conversations after they separated in October 2016.

Defendant testified that he arrived at a marital counseling appointment on March 3, 2017, where the counselor informed him of the victim's accusation; Defendant did not explain how the counselor learned of the allegations.  Defendant stated that he "about collapsed to the floor" and could not believe that the victim would accuse him "of these things."  Defendant said that he called the victim's maternal grandfather, who declined to talk to him, and sent text messages to the victim's mother and maternal grandmother.  Defendant stated that he eventually returned to the basement apartment.  Defendant stated that the accusations made him feel "[l]ike every bit of [his] guts were ripped out and poured out on the floor."

Defendant testified that, by the time Mr. Landis arrived at the home, he had vomited twice and felt dizzy and "utterly done."  He stated that he had not contacted an attorney and that he had been in shock.  Defendant agreed that he answered the questions truthfully and that he did not try to avoid the questions.  Relative to the masturbation video, Defendant explained that she was constantly traveling and that he suggested sexting as a way to "spice up" their love life.  Defendant stated that the victim's mother sent him the video via text message and that he transferred the video to a password-protected application and deleted it from his text messages.

Defendant testified that the children would play games on his and the victim's mother's cell phones.  Defendant hypothesized that the victim could have seen the video on the victim's mother's cell phone, although he acknowledged that the victim could have accessed the protected folder on his phone because he reused his "ATM passcode," which the victim also knew, as the folder's password.

Defendant denied that he ever showed the victim inappropriate photographs or videos, that he laid down on the couch with the victim as the victim's mother described, or that he ever touched the victim inappropriately.  Defendant noted that, in his experience, the victim cried when "she got in trouble or put on the spot."  Defendant described the victim as a "[t]ypical teenage girl; real smart-mouthed; really intelligent; a bit devious at times."  Defendant stated that he and the victim's mother did not continue with marriage counseling and divorced soon after the victim's allegations; he said that he had not seen T.S. in four years.

Defendant testified that he went into a "deep depression" every time the allegations were brought up, that they had changed his life, and that he had gained weight, started smoking heavily, and that he was "constantly under stress."

- 17 -

On cross-examination, Defendant testified that, other than one job in which he worked a night shift, he had worked steadily during his adulthood and "kept normal hours[.]" He agreed with the victim's mother's testimony that their marriage was "basically over" when they separated in October 2016. When asked whether it was "just a matter of time" before the divorce papers were filed, Defendant agreed but stated that, at the time, neither of them wanted to give up on the marriage. He further agreed that the victim's "bringing this out" made the divorce proceed more quickly.

Defendant testified that he loved and missed T.S. and wanted to see her. He stated that, during the divorce or juvenile court proceedings, he had a visit with T.S. at a playground supervised by the victim's mother's father and a friend. Defendant said that the court subsequently ordered that his visits with T.S. be supervised by a DCS employee. Defendant agreed that it was his responsibility to "make that happen"; he said that he contacted two DCS employees but that he "kept getting bounce backs of, I'm in a meeting. I'll try to get back to this later . . . . To the point where nothing ever happened of it." Defendant denied that it was "everyone else's fault," and he noted, "I could have continued every day through them. It's just when you get ignored for so long . . . [.]" Defendant stated that he chose "to get these allegations cleared from [his] name and then move forward." He acknowledged that four years had passed.

Defendant testified that he thought he had a "pretty good" relationship with the victim, that he enjoyed working on the truck together, and that he tried to teach the victim things. He agreed that he wanted the victim and T.S. to grow up in a "happy, safe home" and that he went to "great lengths" to make sure they were safe. Defendant agreed that, in his police interview, he detailed "how [he] did things to make sure [he] was never accused of something like this." Defendant further agreed that the children stayed with the victim's maternal grandparents when she was traveling "[b]ecause [he] was afraid of being accused of something like this" and that he would "end up in a situation like we're in today[.]" Defendant testified that his mother and some of the victim's relatives "were victims" of sexual abuse and that he and the victim's mother discussed that it was inappropriate for him to see T.S. nude after she turned one year old, other than during diaper changes.

Defendant testified that he was not "necessarily" the member of his household most "savvy with tech devices." He noted that "[k]ids these days" could "outdo" him. Defendant acknowledged that he administered databases and "systems" in his career, although he stated that he "was entry level at that point." Defendant agreed that he wanted to protect the children from seeing "dangerous things" on the internet. Defendant stated that he mainly used the monitoring software on the victim's cell phone to check alerts for "profanities, images, stuff like that" rather than "investigating her entire life." Defendant said that the only touchscreen computer in the house was in his office and that the computer automatically logged in when it was started. Defendant agreed that he had told Mr. Landis

that he had viewed pornography on the computer and that the victim had discussed having seen "nudist pictures" on the computer. Defendant stated that he volunteered the information to Mr. Landis because he "wanted to be open [and] honest[.]" Defendant said that the nudist photographs were probably the last thing he viewed on the computer before moving out of the marital home.

Defendant acknowledged the victim's mother's testimony that she deleted the masturbation video after sending it. Defendant agreed that he was "truly concerned" about how the victim saw the video because he put it in the secure folder program. He acknowledged the victim's testimony that Defendant kept the video in the secure folder program. Defendant agreed that, when confronted with the victim's having seen the masturbation video, he "couldn't come up with, well, she played on [his] phone all the time, that's how she saw it[.]"

When asked whether the victim would have cried on the witness stand from "making . . . up" the alleged events, Defendant stated, "I'm saying every time she got backed into a corner, whether she did something, she didn't do something, whenever she felt threatened in any nature, tears would start coming." He agreed that the victim was "backed into a corner being here on the stand[.]"

Defendant acknowledged that his police interview corroborated the victim's testimony relative to the nudist photographs on the touchscreen computer; the existence of the masturbation video; and the video's being stored in the secure folder. Defendant disagreed that he eliminated "every single avenue of [the victim] seeing that video except [his] showing her."

Defendant denied ever bathing with the victim or seeing her nude. He stated that, on the occasion during which he pushed her into the shower clothed, the six-year-old victim agreed to shower and "that was the end of it."

After the defense rested, the State recalled the victim's mother as a rebuttal witness. The victim's mother testified that, to her knowledge, she did not have a scheduled marriage counseling appointment on March 3, 2017. The victim's mother denied calling the counselor and telling him about the allegations. The victim's mother stated that she and the children did not have the passcode to Defendant's cell phone or his debit card and that she never saw the children use Defendant's debit card. On cross-examination, the victim's mother testified that Dr. Daniel Rock was their marriage counselor and that she did not know where Dr. Rock was located at the time of trial.

The victim testified in rebuttal that she had not known the passcode to Defendant's cell phone, the secure folder, or Defendant's debit card. The victim noted that, if she had

known the passcode to the victim's mother's phone, it would have been once she was older and in eighth grade.

On cross-examination, the victim stated that she had not known the passcode for the household's computers and that the victim's mother or Defendant had to type the passcode for her. The victim stated that her laptop had "limited Internet access."

After the close of the rebuttal proof, the trial court held a jury charge conference. Defendant did not request any special jury instructions but renewed[5] an objection to the election of offenses, as listed on the verdict forms.

During the State's closing, the prosecutor argued as follows:

[The victim] told you that she remembered being nine years old and being at home in Kingston Springs after the birth of [T.S.] . . . . And being at home with the Defendant, who took his clothes off, took her clothes off, brought her into the bath, starting rubbing on her breasts. Had her -- the Defendant had her rub on his body, touch his penis. And then, eventually, he . . . insert[ed] his penis into her anus. She described that as painful. She also sat here, arguably, and she told you that this was embarrassing. This was something that she was keeping to protect others. She didn't want to make someone else's life worse, so this young lady sat here and talked about [Defendant], her stepfather. He anally penetrated her at her home in Cheatham County. She vividly remembered that. Ladies and gentlemen, that is Count 1 of this indictment. That is Rape of a Child. Count 2 of this indictment is also Rape of a Child, where she sat there and she discussed him putting his fingers inside of her.

You'll also see evidence that's been submitted in an Our Kids report. And in the Our Kids report, there's detailed descriptions that [the victim] gives medical professional personnel and social workers about what happened . . . . You will be able to see this exhibit. Just sit there and read the words of [the victim]; to read about penetration of his fingers; to read about the Defendant placing his mouth on her vagina. That's Count 3 of this indictment for Rape of a Child, the Defendant placing his mouth on her vagina. Count 4 is also Rape of a Child, and it deals with the time when [Defendant] had [the victim] put her mouth on his penis. Count 5 is what's called Aggravated Sexual Battery. And that charge requires the unlawful

_____

[5] Defendant initially raised the objection at the close of the State's case-in-chief, when the State announced its elections. We will detail that jury-out hearing in the analysis below.

touching of someone -- in this case, under 13 years of age -- on their intimate parts . . . .  Count 5 of this is when [Defendant] sat there and rubbed [the victim's] breast.  She described that in the bathtub.  She described it at nine years old being in the bathtub with the Defendant, and he touched her breasts and he rubbed up under her.  She also talked about Count 6, where he touched her vagina as well, for no other purpose.  She talked about that, I believe, in the office.  She sat there and said this happened multiple times at the home in Kingston Springs.  Count 7 of this indictment is Aggravated Sexual Battery, and that will be for when [Defendant] required [the victim] to touch his penis.  And if you look in the Our Kids report, you could see where she describes also seeing [Defendant] ejaculate, showing that he was getting sexual gratification.

Count 8 is Incest.  Count 8, 9, 10, and 11 are all Incest.  And in order for those elements to be met, 'unlawful sexual penetration of an individual -- by penetration of an individual by someone who is related by blood or marriage.  And in this case, it's going to be a stepfather.

. . . .

The Incest charges relate to the first four counts of Rape of a Child, where he penetrated her . . . or his body parts penetrated her from him.  They all stem from those charges.  You can't have sexual relations with someone who is your stepchild.

Upon this evidence, the jury convicted Defendant of the lesser-included offense of Aggravated Sexual Battery in Count 1; Rape of a Child in Counts 2, 3, and 4; Aggravated Sexual Battery in Counts 5, 6, and 7; and Incest in Counts 9, 10, and 11.  The jury returned a not guilty verdict relative to Count 8, Incest.

Following a sentencing hearing, the trial court imposed sentences of twenty-six years for each Rape of a Child conviction in Counts 2, 3, and 4, to be served consecutively; nine years for each Aggravated Sexual Battery conviction in Counts 1, 5, 6, and 7, to be served concurrently with one another and the sentence in Count 2; and four years for each Incest conviction in Counts 9, 10, and 11, to be served concurrently with one another and the sentence in Count 2, for a total effective sentence of seventy-eight years at one hundred percent service.

The trial court subsequently denied Defendant's timely motion for new trial, in which he raised as issues the State's election of offenses, the jury instructions

corresponding to the election, and the trial court's restricting his cross-examination of Mr. Landis.  This timely appeal follows.

## Analysis

### I. Election/Jury Instructions

On appeal, Defendant contends that the trial court erred by finding that the State's elections were adequate to ensure jury unanimity.  He argues that the elections were "vague, ambiguous, and unsupported by the evidence."

Relatedly, Defendant argues that the trial court "compounded" the error by failing to "differentiate[] between an election between specific offenses and those of a continuous nature" in the jury instructions.  He submits that the victim's testimony was composed of generic evidence and that the trial court incorrectly issued the pattern instruction on the election of specific offenses, rather than a modified unanimity instruction in which the jury would be "required to find the Defendant guilty of all counts as charged in order to find him guilty of any counts[.]"  Defendant notes that the jury "did not find [him] guilty of all offenses" and convicted him of a lesser-included offense in Count 1 and acquitted him in Count 8.

The State responds that its elections were sufficient because it elected a different type of sexual penetration or touching for each count of the indictment.  It likewise argues that the jury instructions were proper because the State relied on specific evidence.

#### a.  Trial Proceedings

After the close of the State's evidence, the State announced[6] the following election of offenses:

> In Count 1 . . . the State elects that on or about March 3, 2012 through March 3, 2016, the victim testified she was anally penetrated by the Defendant with his penis in her home in Cheatham County, Tennessee.

> In Count 2, Rape of a Child, the State of Tennessee elects that on or about March 3, 2012 through March 3, 2016, the victim testified that the Defendant digitally penetrated the victim's vagina at her home in Cheatham County, Tennessee.

---

[6] The State also filed an identical written election of offenses.

In Count 3, Rape of a Child, the State of Tennessee elects that on or about March 3, 2012 through March 3, 2016, the victim testified that the Defendant performed oral sex on the victim's vagina at her home in Cheatham County, Tennessee.

In Count 4, Rape of a Child, the State of Tennessee elects that on or about March 3, 2012 through March 3, 2016, the victim testified that the Defendant made the victim perform oral sex on his penis at her home in Cheatham County, Tennessee.

In Count 5, Aggravated Sexual Battery, the State of Tennessee elects that on or about March 3, 2012 through March 3, 2016, the Defendant had unlawful sexual contact with the victim by touching the victim's breast for the Defendant's sexual gratification at the victim's residence in Cheatham County, Tennessee.

In Count 6, Aggravated Sexual Battery, the State of Tennessee elects that on or about March 3, 2012 through March 3, 2016, the Defendant had unlawful sexual contact with the victim by touching the victim's vagina for the Defendant's sexual gratification at the victim's residence in Cheatham County, Tennessee.

In Count 7, Aggravated Sexual Battery, the State of Tennessee elects that on or about March 3, 2012 through March 3, 2016, the Defendant had unlawful sexual contact with the victim by requiring the victim to touch the Defendant's penis for the Defendant's sexual gratification at the victim's residence in Cheatham County, Tennessee.

In Count 8, Incest, the State of Tennessee elects that on or about March 3, 2012 through March 3, 2016, the victim testified that she was anally penetrated by the Defendant with his penis at the victim's residence in Cheatham County, Tennessee.

In Count 9, Incest, the State of Tennessee elects that on or about March 3, 2012 through March 3, 2016, the victim testified that the Defendant digitally penetrated the victim's vagina at the victim's residence in Cheatham County, Tennessee.

In Count 10, Incest, the State of Tennessee elects that on or about March 3, 2012 through March 3, 2016, the victim testified that the Defendant

performed oral sex on the victim's vagina at the victim's residence in Cheatham County, Tennessee.

In Count 11, Incest, the State of Tennessee elects that on or about March 3, 2012 through March 3, 2016, the victim testified that the Defendant made the victim perform oral sex on his penis at the victim's residence in Cheatham County, Tennessee.

After the State made its election, defense counsel objected, arguing as follows:

The whole point of an election of offenses is so that the jury can be unanimous with regard to each count. These counts are not distinguished in any way in terms of the facts. In terms of the testimony of [the victim], the only specific testimony that she gave was with regard to the first time this ever happened. That was where she talked about that she believed it was during the summer where he came in and had his clothes off, made her take her clothes off, they took a bath together, he touched her, she touched him. He went to the office and put some pictures on the computer, videos of girls masturbating.

And in terms of the penetration, the only penetration she talked about with regard to that incident was, he stuck his penis in my butt. And she said that was weird and painful. After that, all she said was, this happened two or three more times in this four-year period. This happened a few times in this four-year period. This happened a few times in this four-year period. That was her testimony. There is no way this jury can determine in a unanimous fashion, the proof with regard to each of these counts.

Defense counsel stated relative to the motion for judgment of acquittal that only one count of Rape of a Child should be submitted to the jury. He argued that, regarding Aggravated Sexual Battery, "it's not distinguished enough to have separate counts. I would submit it was all part of the same criminal act . . . . That should be one count. The Incest, I would submit that that is not even applicable here with regard to this particular incident." Defendant counsel further argued,

There is just no way possible for a jury to come to a unanimous verdict on these individual counts, because that's what they are. They are individual counts . . . . [I]t's okay in an indictment for the State to allege just a series of criminal acts over a period of time. But when it comes down to the election of offenses after the proof has been introduced, the State has an obligation to present sufficient evidence so that the jury can consider that

- 24 -

evidence on each individual count. And again, that ties into my argument with regard to the motion for judgment of acquittal, with regard to all but three -- actually, it'd be all but two, I think, that they have submitted enough evidence for one Rape of the Child, and one Aggravated Sexual Battery."

The State responded that the victim's testimony and the Our Kids report contained sufficient evidence to submit each count of the indictment to the jury. The prosecutor stated, "There's plenty of evidence for the . . . jury to go on. And any issue with the generality, or specificity, of the victim's testimony is why we have *State v[.] Qualls*, [482 S.W.3d 1 (Tenn. 2016),] and . . . Your Honor makes a decision whether the modified unanimity instruction comes in or not."

The trial court denied the motion for judgment of acquittal, finding that the victim had "specific memories about different acts and stated that this occurred between these time periods" and that "while this is not the strongest case, I do have to look at the light most favorable to the prosecution and rule that there are facts . . . upon which the jury could find beyond a reasonable doubt."

The trial court ultimately issued the pattern jury instruction on election of offenses, as follows:

> The [S]tate has offered proof in its case in chief of more than one act allegedly committed by the defendant which the [S]tate alleges constitutes an element of the offenses charged in the indictment. To ensure a unanimous verdict, the law requires the [S]tate to elect which alleged act testified to the [S]tate is relying upon for your consideration in deciding whether or not the defendant is guilty of this offense or any lesser[-]included offense. The fact that the court has required the [S]tate to elect does not mean that the court has found that the [S]tate has carried its burden of proving those allegations beyond a reasonable doubt; that is for your determination.

> In this case, the [S]tate has elected to submit for your consideration the alleged acts which are set out in the verdict form.

The verdict forms contained identical language to the State's written elections.

### b. *Applicable Law on Election Doctrine*

"[W]hen it is properly preserved, the issue of whether the election requirement has been satisfied is a question of law, to which de novo review applies." *Qualls*, 482 S.W.3d at 8 (citing *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014)). Errors in jury instructions

and in the State's election of offenses are non-structural constitutional errors subject to harmless error analysis. *Id.* at 17-18. Although the State's closing argument "cannot 'cure' the failure to elect offenses or serve as an 'effective substitute,' this court may consider the State's closing as part of a constitutional harmless error analysis." *State v. Riley*, No. M2022-01529-CCA-R3-CD, 2024 WL 1092346, at *9 (Tenn. Crim. App. Mar. 13, 2024) (citing *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

Article 1, section 6 of the Tennessee Constitution, providing in relevant part that "the right of trial by jury shall remain inviolate," guarantees criminal defendants the right to a unanimous jury verdict. *Qualls*, 482 S.W.3d at 9 (citing *State v. Lemacks*, 996 S.W.2d 166, 169-70 (Tenn. 1999), and *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993)).

> In most criminal trials, the constitutional guarantee of juror unanimity is readily satisfied . . . because it is a general rule that evidence the defendant has committed "some other crime wholly independent of that for which he is charged, even though it is a crime of the same character" is generally excluded as "irrelevant."

*Id.* (quoting *State v. Rickman,* 876 S.W.2d 824, 827 (Tenn. 1994) (citations omitted)); *see* Tenn. R. Evid. 404. However, in cases involving sexual offenses, trial courts may admit evidence of other sexual crimes when an indictment charges a number of sexual offenses but does not allege the specific date such offenses occurred. *Qualls*, 482 S.W.3 at 9 (quoting *Rickman,* 876 S.W.2d at 828). However, in such cases, the State has a "duty . . . to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt." *Id.* (citing *Rickman*, 876 S.W.2d at 828); *see Shelton,* 851 S.W.2d at 137; *see also Burlison v. State,* 501 S.W.2d 801, 803 (Tenn. 1973).

> The election doctrine . . . assists the defendant in preparing for and defending against the specific charge, protects the defendant from double[ ]jeopardy concerns, enables the trial judge to review the weight of the evidence in its role as thirteenth juror[, and] enables an appellate court to review the legal sufficiency of the evidence. Nevertheless, as this [c]ourt has previously emphasized, the most important purpose served by the election of offenses doctrine is to ensure that the jurors deliberate over and render a verdict based on the same offense[.]

*Qualls*, 482 S.W.3d at 10 (internal citations and quotation marks omitted). In short, such practice allows the State latitude when prosecuting criminal acts against young children while simultaneously preserving a criminal defendant's right to a unanimous jury verdict. *Id.*; *see Rickman,* 876 S.W.2d at 828; *see also Shelton,* 851 S.W.2d at 137 ( "A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to

ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence.") (citing *State v. Brown,* 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991)). Our supreme court "has 'stressed that the election requirement is a responsibility of the trial court and the prosecution and, therefore, does not depend on a specific request by a defendant.'" *State v. Fields*, No. W2018-02014-CCA-R3-CD, 2020 WL 5015902, at *8 (Tenn. Crim. App. Aug. 25, 2020) (quoting *State v. Kendrick*, 38 S.W.3d 566, 569 (Tenn. 2001)), *perm. app. denied* (Tenn. Dec. 3, 2020).

Our supreme court has discussed previously the "practical difficulties" of applying the election doctrine in child sexual abuse cases and the court's practice of allowing "the State some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." *Qualls*, 482 S.W.3d at 10 (quoting *Rickman*, 876 S.W.2d at 828). Our supreme court noted that "[t]here is no right to a perfect election" and that the election requirement can be satisfied in numerous ways. *Id.* at 10. The court explained:

> For example, the State may elect a particular offense by "narrow[ing] the multiple incidents by asking the victim to relate any of the incidents to a specific month," *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997), "identify[ing] a particular type of abuse and elect[ing] that offense[,] . . . [or] identify[ing] an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit," *Shelton*, 851 S.W.2d at 138.

*Id.* at 10-11.

> In *Qualls*, however,
>
> the victims described with clarity the type of sexual battery perpetrated on them but failed to identify specifically when each alleged act occurred. Instead, the victims here described a pattern of abuse that occurred over an extended period of time. One of the victims testified that the act of sexual battery occurred once a week. Both victims testified that the abuse occurred regularly and happened at least once during the time periods charged in each count of the indictment.

*Id.* at 12. Our supreme court concluded that this testimony constituted "generic evidence" describing a pattern of abuse, which "is often the only proof available in some of the most severe child sexual abuse cases . . . involv[ing] resident molesters who abuse their victims for years[.]" *Id.*; *see People v. Jones*, 792 P.2d 643, 648 (Cal. 1990). Our supreme court noted that, in *Jones*, the California Supreme Court determined that protecting an accused's

- 27 -

rights to proof of guilt beyond a reasonable doubt and jury unanimity can still be achieved in generic evidence cases and discussed the *Jones* requirements for generic testimony, as follows:

> the victim's generic testimony must (1) describe "*the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct . . . . "; (2) identify "the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping')"; and (3) designate "*the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us') to assure the acts were committed within the applicable limitation period."

*Id.* at 13 (quoting *Jones*, 792 P.2d at 655).

Noting that a strict application of the election doctrine would allow the most egregious perpetrators of child sexual abuse to escape criminal convictions, our supreme court adopted an "either/or" rule in which the trial court could issue a modified unanimity instruction stating that, in order to find the defendant guilty of the offenses for which he was accused, the jury must agree that he or she was guilty of all the offenses described by the victim. *Id.* at 15-16. Our supreme court stated, however, that it limited its holding "to cases involving only generic evidence" and explained in a footnote, "[W]e reserve for an appropriate case the question of how the election doctrine may be satisfied in cases involving both generic and specific evidence." *Id.* at 16 n.14.

We note Defendant's argument that *Qualls* mandates that the jury convict on "all counts as charged" in cases involving generic evidence. Limiting our review to the facts of this case, the victim clearly offered both specific and generic testimony. In such cases, this court has applied *Qualls* by examining the counts of the indictment; when a count of the indictment is supported by specific evidence, the traditional election rule applies, and this court examines the sufficiency of the State's election. When a count of the indictment is supported by generic evidence, this court has determined that the State must request a *Qualls* modified unanimity instruction or be bound by the sufficiency of the election it has made. *See, e.g.*, *State v. Guin*, No. E2022-00391-CCA-R3-CD, 2023 WL 8675582, at *8 (Tenn. Crim. App. Dec. 15, 2023) (examining the sufficiency of the State's elections when "the State chose to pursue a conviction by electing a specific incident and did not ask the trial court for a modified unanimity instruction as required by *Qualls*), *perm. app. denied* (Tenn. May 16, 2024); *State v. Perry*, No. M2022-00643-CCA-R3-CD, 2023 WL 6150852, at *10 (Tenn. Crim. App. Sept. 21, 2023) (stating that a *Qualls* instruction was

appropriately given when a two-count indictment charged the defendant with two counts of Rape of a Child, one based upon penile-vaginal penetration and the other based upon oral sex; the victim described almost daily abuse occurring during a five-year period and, although she described some specific instances of conduct, this court noted that the evidence was properly classified as generic), *perm. app. denied* (Tenn. May 14, 2024); *State v. Patrick*, No. M2019-02026-CCA-R3-CD, 2021 WL 2102914, at *9 (Tenn. Crim. App. May 25, 2021) (concluding that the trial court correctly issued a *Qualls* instruction relative to one count of Rape of a Child where the defendant was charged with two counts of Rape of a Child; the State elected a specific instance of digital penetration in the first count, but it based the second count on the victim's testimony that the defendant touched her vaginal area on multiple other occasions and attempted to insert his penis into her anus), *perm. app. denied* (Tenn. Feb. 10, 2022).

In the present case, the record reflects that, after Defendant objected to the sufficiency of the State's elections, the prosecutor mentioned *Qualls* by name to the trial court and added that the court would decide which instruction to give based upon the evidence. However, the State then proceeded to rely on its elections as stated, and neither the State nor the trial court raised the possibility of a *Qualls* instruction again. The trial court ultimately issued the general pattern instruction on jury unanimity and the election of offenses. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim 42.25.

The State has a duty to make sufficient elections in child sexual abuse cases includes requesting a modified unanimity instruction in generic evidence cases. *See Qualls*, 482 S.W.3d at 9. Likewise, we emphasize that the trial court has an independent duty to ensure that the jury is properly instructed regardless of requests from the parties, including determining whether a *Qualls* instruction is appropriate. *State v. Cole-Pugh*, 588 S.W.3d 254, 260 (Tenn. 2019) ("In criminal cases, trial courts have the duty, without request, to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial") (quoting *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013)).

Because the State opted to make elections for every count of the indictment, we will examine the sufficiency of those elections in light of the evidence presented. The elections in this case were not distinguished by date, temporal proximity to an event, or a more specific location than the family home; the elections centered on the type of penetration for each count of Rape of a Child or the body part that was the subject of each of the Aggravated Sexual Battery counts. The Incest counts corresponded to each count of Rape of a Child.

1. Count 1 – Rape of a Child

The State's election in Count 1 stated that, "on or about March 3, 2012 through March 3, 2016, the victim testified she was anally penetrated by the Defendant with his penis in her home[.]" The victim gave detailed testimony about the first incident of abuse occurring when she was ten years old, during which Defendant was nude, had the victim undress, took a bath with the victim, took her into the office and showed her pornography, and laid her on the floor in the office, touched her chest, buttocks, and inserted his penis into her anus. She later stated that she thought the anal penetration only occurred one time, but she could not be sure. Because only one incident of anal penetration was described, we conclude that the State's election in Count 1 was sufficient.

2. Counts 2 and 9 – Rape of a Child and Incest

The State's election in Count 2 stated that, "on or about March 3, 2012 through March 3, 2016, the victim testified that the Defendant digitally penetrated the victim's vagina at her home[.]" Count 9 relied upon the digital penetration in Count 2. The victim testified that, on an occasion other than the first incident, Defendant inserted his fingers into her vagina. She then stated that the penetration occurred in her bedroom, Defendant's bedroom, the office, and the living room, indicating that she was referring to multiple occasions. The victim was unsure where most of the incidents of digital penetration occurred, and she did not know how many times they occurred. The victim's testimony in this regard was generic evidence, and the State's election did not ensure that the jury unanimously agreed that Defendant digitally penetrated the victim on the same occasion.

3. Counts 3 and 10 – Rape of a Child and Incest

The State's election in Count 3 stated that, "on or about March 3, 2012 through March 3, 2016, the victim testified that the Defendant performed oral sex on the victim's vagina at her home[.]" Count 10 relied upon the oral penetration in Count 3. The victim testified that, on an occasion other than the first incident of abuse, Defendant put his mouth on the victim's vagina. The victim then stated that the penetration occurred in her bedroom, Defendant's bedroom, the office, and the living room, indicating that she was referring to multiple occasions of oral penetration. The victim could not recall how many times Defendant performed oral sex on her. The victim's testimony in this regard was generic evidence, and the State's election was insufficient to ensure that the jury unanimously agreed that Defendant orally penetrated the victim on the same occasion.

### 4. Counts 4 and 11 – Rape of a Child and Incest

The State's election in Count 4 stated that, "on or about March 3, 2012 through March 3, 2016, the victim testified that the Defendant made the victim perform oral sex on his penis at her home[.]" Count 11 relied upon the oral penetration in Count 4. The victim testified that, on an occasion other than the first incident of abuse, Defendant put his penis in her mouth. The victim then stated that the incidents occurred in her bedroom, Defendant's bedroom, the office, and the living room, indicating that she was referring to multiple occasions of oral penetration. The victim only knew that she was made to perform oral sex on Defendant "multiple" times. In the Our Kids report, the victim stated that her mouth touched Defendant's penis one time when she was nine years old. The victim's testimony in this regard was mostly generic evidence, and the State's election was insufficient to ensure that the jury unanimously agreed that Defendant orally penetrated the victim on the same occasion.

### 5. Count 5 – Aggravated Sexual Battery

The State's election in Count 5 stated that, "on or about March 3, 2012 through March 3, 2016, the Defendant had unlawful sexual contact with the victim by touching the victim's breast for the Defendant's sexual gratification[.]" The victim testified that Defendant touched her breasts during the first incident in the bathtub and the office, as well as in subsequent incidents. The victim did not know any further details of these subsequent incidents and could not estimate how many times it occurred. Because both specific and generic evidence was offered in this regard, the State's election was not sufficient to ensure that the jury unanimously agreed that Defendant had touched the victim's breasts on the same occasion. However, the State's closing specified that its election referred to the touching that occurred in the bathtub during the first incident of abuse. Because the State narrowed the jury's attention to one discrete instance of touching, and the jury was generally instructed on the unanimity requirement and presumed to follow the trial court's instructions, we conclude that the error relative to Count 5 was harmless beyond a reasonable doubt. *See Qualls*, 482 S.W.3d at 17-18.

### 6. Count 6 – Aggravated Sexual Battery

The State's election in Count 6 stated that, "on or about March 3, 2012 through March 3, 2016, the Defendant had unlawful sexual contact with the victim by touching the victim's vagina for the Defendant's sexual gratification at the victim's residence[.]" The victim testified that Defendant touched her vagina during the first incident in the bathtub and in the office, as well as in subsequent incidents. The victim did not know any details of the subsequent incidents and could not estimate how many times it occurred. Because both specific and generic evidence was offered in this regard, the State's election was not

sufficient to ensure that the jury unanimously agreed that Defendant had touched the victim's vagina on any specific occasion.

We note that the State's closing directed the jury's attention to the Our Kids report, which reflects that the victim reported Defendant's touching her vagina more than once beginning when she was nine years old and ending when she was thirteen years old. The State's phrasing in this portion of its closing arguably related to its previous sentence referring to the first incident of abuse: "She also talked about Count 6, where he touched her vagina as well, for no other purpose [than sexual gratification]. She talked about that, I believe, in the office." However, the prosecutor continued to state that the victim said "this happened multiple times at the home[.]" In total, the State's closing argument highlighted generic evidence and was not sufficient, standing alone, to render the error harmless beyond a reasonable doubt.

### 7. Count 7 – Aggravated Sexual Battery

The State's election in Count 7 stated that, "on or about March 3, 2012 through March 3, 2016, the Defendant had unlawful sexual contact with the victim by requiring the victim to touch the Defendant's penis for the Defendant's sexual gratification at the victim's residence[.]" The victim testified that she touched Defendant's penis during the first incident in the bathtub. When asked whether she knew how many times she was required to touch Defendant's penis with her hand, the victim responded negatively. The Our Kids report reflects that the victim provided no further detail about these incidents during her interview. Because the victim described the contact using generic language, the State's election did not ensure that the jury unanimously agreed that Defendant made the victim touch his penis on the same occasion. Therefore, the State's election was insufficient.

In its appellate brief, the State refers to *State v. Tice*, No. M2021-00495-CCA-R3-CD, 2022 WL 2800876, at *33 (Tenn. Crim. App. July 18, 2022), *perm. app. denied* (Tenn. Dec. 14, 2022), for the proposition that "the election requirement applies to offenses, not the facts supporting each element of the offense" and that "a jury is not required to 'unanimously agree as to facts supporting a particular element of a crime so long as the jury agrees that the appellant is guilty of the crime charged.'" (quoting *State v. Adams*, 24 S.W.3d 289, 297 (Tenn. 2000)). This court has previously noted that "[m]any cases have boldly declared that jurors are not required to unanimously agree on the facts supporting a particular element of an offense as long as the jury agrees that the defendant is guilty of the offense charged . . . . However, the key cases cited for this holding all involved a single incident in which there was only one criminal offense at issue." *State v. Green*, No. M2021-01438-CCA-R3-CD, 2023 WL 2663102, at *12 (Tenn. Crim. App. Mar. 28, 2023) (distinguishing the defendant's case, which involved a four-count indictment charging two

- 32 -

counts of rape and two counts of assault by extremely offensive or provocative physical contact), *no perm. app. filed*. We further note that, in *Tice*, this court proceeded to conclude that the election in one count of aggravated statutory rape was sufficient because the victim "was able to sufficiently detail this offense by providing specific details and distinguishing characteristics," namely, that the defendant drove him to a road behind her house, where they had sexual intercourse in the defendant's van. *Tice*, 2022 WL 2800876, at *33. The victim in Defendant's case gave significantly more generic testimony, which fell squarely into the category of evidence addressed by *Qualls*.

Having concluded that the election in Count 1 was sufficient and that the insufficient election in Count 5 was harmless beyond a reasonable doubt, we must examine whether the insufficient elections in Counts 2, 3, 4, 6, 7, 8, 9, 10, and 11 were harmless. "Although the jury did not receive the modified unanimity instruction, the State elected the type of sexual contact . . . on which it was relying" and sought one conviction per type of penetration or sexual touching during the period covered by the indictment. *Qualls*, 482 S.W.3d at 19. The trial court also "explicitly discussed the need for juror unanimity in the jury instructions." *Id.*; *see* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim 42.25.

As in *Qualls*, Defendant's theory at trial was a "blanket denial" that any sexual contact occurred; in the absence of medical evidence that could be attributed to the abuse, the main issue in this case was Defendant's and the victim's credibility. *Id.* Although the jury convicted Defendant of a lesser-included offense in Count 1, it found Defendant guilty of Aggravated Sexual Battery, indicating that the jury believed the victim's testimony that Defendant's penis touched her buttocks and anal area but did not find, based upon her testimony and the Our Kids report, that penetration occurred. The jury convicted Defendant as charged in the other counts of the indictment except in Count 8, which relied upon the existence of sexual penetration in Count 1.

In sum, the jury, by its verdict, credited the victim's testimony that Defendant sexually abused her and discredited Defendant's testimony to the contrary. *See id.* (concluding that the errors in the State's elections were harmless because "the record on appeal demonstrates beyond a reasonable doubt that by convicting the defendant, the jury expressed its unanimous conclusion that the victims were credible and that the defendant committed all the acts described by the victims"); *State v. Ledbetter*, No. M2018-00846-CCA-R3-CD, 2020 WL 853733, at *16 (Tenn. Crim. App. Feb. 20, 2020) (concluding that trial court's error in declining to provide a *Qualls* instruction was harmless beyond a reasonable doubt because "[b]y its verdict, the jury indicated it credited the victim's testimony and rejected the Defendant's testimony that his actions with the victim did not include sexual contact and sexual intercourse" and that "had the generic evidence instruction been given, the jury would have found that all of the incidents . . . occurred and that the jury would have returned a guilty verdict"), *no perm. app. filed*. We conclude that,

even if the jury had received the modified unanimity instruction relative to Counts 2, 3, 4, 5, 6, 7, 9, 10, and 11, its verdict would have been the same and that the error was therefore harmless beyond a reasonable doubt. Defendant is not entitled to relief on this basis.

## II. Cross-examination

Defendant argues that the trial court abused its discretion by preventing him from cross-examining Mr. Landis regarding his having mishandled evidence in a previous case, which resulted in his resignation from the Cheatham County Sheriff's Office. The State responds that the trial court correctly found that the information was not probative of Mr. Landis' truthfulness and, alternatively, that any error was harmless.

During a recess at trial, the parties addressed Defendant's Rule 608 motion, in which he sought to elicit testimony from Mr. Landis about an unrelated criminal case, *State v. Christopher Stefko*,[7] in which "there was a discrepancy as far as collecting some physical evidence." Three documents were marked for identification and submitted into the trial record.

In an April 10, 2019 letter addressed to Defendant's counsel entitled "Notice of 'Giglio Material' [*Giglio v. United States*, 405 U.S. 150 (1972)]," Assistant District Attorney General David Wyatt wrote as follows:

> I am writing this letter to provide information favorable to the defense in the case against your client. While the information contained in this letter did not involve your client directly, this information must be disclosed as it goes to the credibility of a law enforcement officer.

> The Office of the Public Defender filed a motion alleging prosecutorial misconduct in *State v. Christopher Stefko*, Cheathan County Case Number 18503 & 18504. A hearing was conducted on January 15, 2019[,] in the Circuit Court of Cheatham County, Tennessee, Honorable David D. Wolfe presiding.

> During the week of January 7, 2019, the State discovered a number of items of evidence that were never collected from the scene or from family members of the deceased in this case. Immediately upon discovery [of] these issues the State notified the defense. The defense filed [a] motion in response to these issues.

---

[7] The transcript spells the defendant's surname "Stethco"; however, the record reflects that the correct spelling is Stefko.

The defense called several witnesses including Sheriff Mike Breedlove, Assistant District Attorney General David Wyatt, attorney Leonard Belmares, Assistant District Attorney General Margaret Sagi, Lt. Shannon Helfin, and [Mr.] Landis.

The following *Giglio* issues came to light during the hearing:

- [Mr. Landis] failed to collect physical evidence while at the crime scene on October 3, 2017;

- [Mr.] Landis failed to document the collection of evidence from Ms. Betty Tomlin, the victim's mother, on two separate occasions;

- [Mr.] Landis testified he collected evidence from Ms. Tomlin in January 2018, but the State contends the evidence was collected in March 2018;

- [Mr.] Landis testified that he took certain field notes while interviewing Ms. Tomlin in January 2018. It is the State's contention that the field notes at issue were written while remotely observing an interview of Ms. Tomlin by Lt. Heflin on December 15, 2017;

- [Mr.] Landis testified that he was unaware of certain evidence in the possession of Ms. Tomlin when Detective Landis' own field notes from either December 2017 or January 2018 state these items were in Ms. Tomlin's possession;

- At the conclusion of the hearing Judge Wolfe stated that he had ". . . some real issues with the credibility of Mr. Landis."

A copy of the transcript from the January 15, 2019 hearing is available from our office upon request. The State is also awaiting a formal written order from Judge Wolfe. Once the order has been filed, a copy of the order will be available upon request. It is also important for you to know that Mr. Landis resigned from the Cheatham County Sheriff's Office on April 5, 2019.

Mr. Landis' April 5, 2019 letter of resignation stated as follows:

It is with a heavy heart that I sit down and write this letter, but due to circumstances beyond my control I must formally submit my resignation effective April 5, 2019.

I started this career in November of 1989, and stepped out of it a couple times, but I realized that it was in my blood. I watched as this profession has changed over the past thirty years, and I was very proud to have been a part of it.

I just want to say thank you for everything, it was a great honor to serve you both, and the citizens of Cheatham County.

It is with great sadness and duress that I sign this[.]

Judge Wolfe's order denying Mr. Stefko's motion to dismiss stated as follows:

This cause is before the court on the [Mr. Stefko's] Motion to Dismiss for *Brady* Violations and Prosecutorial Misconduct filed January 11, 2019. The court conducted a hearing on the motion on January 15, 2019, and at the conclusion of the hearing both [Mr. Stefko] and the State requested time to submit additional briefs on the issues raised . . . . Subsequent to the hearing, the State filed a Motion to Disqualify the Public Defender from the case, based upon a conflict with a potential witness, which the court heard and granted . . . [.]

The court has reviewed the court file, the evidence and testimony produced at the hearing, and the legal arguments submitted by the parties, and makes the following findings of fact, conclusions of law and ruling.

FINDINGS OF FACT:

1) [Mr. Stefko] is charged in two separate and distinct cases with second degree murder. The motion before the court deals with case #18503, wherein [Mr. Stefko] is charged in the death of Stacy L. Swarner.

2) The State alleges that [Mr. Stefko] sold drugs to the victim's husband, who then shared them with the victim. The victim died as a result of a drug overdose, and the State alleges [Mr. Stefko] is criminally responsible for her death by supplying the illegal drugs which allegedly led to her death.

3) The Cheatham County Sheriff's department investigated the victim's death. As a part of the investigation, Lt. Heflin interviewed the victim's mother, Betty Tomlin. During that interview, Ms. Tomlin gave information indicating that the victim's husband had made

threats and that he should be considered a possible suspect in her death. Following that interview, Lt. Heflin handed the case over to [Mr.] Landis.

4) The video of the Betty Tomlin interview was not supplied to the District Attorney by [Mr.] Landis as a part of the normal process. There was no follow up investigation, however Ms. Tomlin brought in a bag of additional items alleged to have been in the victim's home, including heroin scales, syringes and needles. She also produced clothing of her daughter. These items remained in [Mr.] Landis' office and were not further investigated or supplied to the District Attorney.

5) The case was originally set for trial in July 2018, however that trial date was continued until January 17, 2019[,] when Assistant District Attorney David Wyatt discovered that the Sheriff's department had a cell phone related to the case which had not been examined, and moved for a continuance. In January 2019, prior to the trial date, Mr. Wyatt followed up with the Sheriff's department and found that a search warrant for the phone had never been obtained. A warrant was then obtained and the results were delivered to the Public Defender representing [Mr. Stefko]. That evidence revealed text messages between [Mr.] Stefko and the victim's husband regarding drug transactions.

6) General Wyatt requested that [Mr.] Landis meet with him to discuss the case, and on January 10, 2019, while reviewing [Mr.] Landis' file, Wyatt noticed handwritten notes in the file indicating a December 15, 2017 interview with the victim's mother.

7) General Wyatt also discovered that Ms. Tomlin had delivered additional items of potential evidence to [Mr.] Landis in January, 2018, which had not been included in the evidence supplied to the District Attorney's office. The material was also not logged into the evidence log.

8) Upon learning of the additional evidence, General Wyatt immediately provided the material to defense counsel, prior to the trial date.

9) After being notified of the additional evidence, the defense filed the Motion to Dismiss, alleging a *Brady* violation and prosecutorial misconduct.

CONCLUSIONS OF LAW:

[Mr. Stefko] initially argued that the charge in this case should be dismissed for "due process violation under *Brady* and prosecutorial [m]isconduct." In the supplemental memorandum . . . [Mr. Stefko] argues alternatively that a jury instruction should be given regarding the State's conduct of the investigation. It is conceded by the State that material evidence, some of which may be exculpatory, was not timely provided by the lead investigator[, Mr.] Landis, and therefore was provided to the defense on a delayed basis. However, the record is clear that the Assistant District Attorney's actions led to the discovery of the additional evidence, and ensured that defense counsel received the information as soon as it was discovered. All of the additional evidence was provided to defense counsel before the trial date and the trial was continued to ensure that the defense had ample time to review the evidence and prepare accordingly.

Based upon this court's review of the testimony, and the exhibits at the hearing, the court finds that no "prosecutorial misconduct" occurred in this case. While the investigation and handling of evidence by the Cheatham County Sheriff's detective was obviously negligent, it was through the efforts of the Assistant District Attorney General Wyatt that the additional undisclosed evidence was located and immediately provided to the defense. This court is aware of prior issues regarding the handling of evidence by [Mr.] Landis, as brought out in the hearing. However, this court does not find that the actions of [Mr.] Landis, or his lack of investigative action in this case is attributable to the District Attorney's staff, nor does it constitute prosecutorial misconduct.

. . . .

Based upon the foregoing, the court finds that no *Brady* violation or prosecutorial misconduct occurred, and [Mr. Stefko]'s motion should be denied. At trial, the court will consider any jury instruction which the defense proposes to address the negligent handling of evidence by the investigator.

The State argued that the judge's ruling on the matter "does not conclude necessarily that [truthfulness] was an issue. He talks about negligent handling of something and prosecutorial misconduct for the State. But there has been nothing put down on the record after that."

The trial court noted that the District Attorney's letter did not state that Mr. Landis "point blank lied. It just says that [the State's] conclusion was that it was done on this date instead of that date. And it could fall to just sheer incompetence of not reviewing or taking correct notes." Upon questioning by the trial court, defense counsel stated that Mr. Landis' "incompetence or negligence is also probative of truthfulness in terms of how he handled this case as well." Defense counsel stated that he intended to ask Mr. Landis whether he was "accused of mishandling evidence, failing to properly process evidence, and misrepresenting where certain notes -- field notes were taken, and where they were located, physically located" in the *Stefko* case and whether he resigned from the police department as a result of the allegations.

The trial court stated, "Again, on the competence, it may come in, in a different route that is relevant, but . . . I'm still stuck on the [Rule] 608 as to whether or not it is conduct probative of truthfulness or untruthfulness." The State asserted that it was not probative of truthfulness, that no finding of malicious conduct had occurred in the *Stefko* case, that the evidence was "turned over" in that case, and that no issue related to *Brady* or prosecutorial misconduct existed. The trial court added, "The problem I'm having with this is that . . . [i]t does not appear as if there's enough there that says that he willfully lied or was untruthful. Incompetence I would understand, you know, with that[.]"

Upon examining Judge Wolfe's order, the trial court stated that it did not "say anything about truthfulness . . . in regard to Mr. Landis. It just says the mishandling." The trial court continued,

> Certainly, if -- And I don't know what you want to testify here today about what evidence he handled or anything like that. If there's anything of that nature you certainly can, you know, cross-examine him about it. Did he quit because of this? I mean, there's nothing in the letter. It just says, I just quit . . . . But with that, I don't see it coming in as probative of truthfulness or untruthfulness. It may be relevant if, you know, there's some evidence, or that he didn't collect or . . . that type of thing. If so, at that point in time we'll have a jury out and address it. But I don't see anything probative of truthfulness or untruthfulness.

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its

discretion in ruling the evidence inadmissible." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id*.

Tennessee Rule 608(b) states the following, in pertinent part:

> (b) Specific Instances of Conduct. Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

> (1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry; [and]

> (2) The conduct must have occurred no more than ten years before commencement of the action or prosecution[.]

Tenn. R. Evid. 608(b).

Here, the trial court held a jury-out hearing prior to Mr. Landis' testimony to determine the admissibility of his statements and conduct in the *Stefko* case and determined

that they were not probative of Mr. Landis' truthfulness. As a result, the trial court concluded that Defendant could not question Mr. Landis about the prior incident.

The record supports the trial court's finding that the documents exhibited to the hearing did not establish that Mr. Landis was untruthful. Our review of General Wyatt's letter, Judge Wolfe's order, and Mr. Landis' resignation letter reflects that, although Judge Wolfe apparently took issue with Mr. Landis' credibility at a hearing,[8] he ultimately concluded that what occurred was the result of negligence. Accordingly, the trial court properly found that the information was inadmissible as impeachment evidence because it was not probative of Mr. Landis' truthfulness.

Moreover, we agree with the State that any error in this regard would have been harmless. Mr. Landis' testimony in its entirety consisted of laying a foundation for Defendant's recorded police interview; his credibility as a trial witness was not essential to the State's case against Defendant. Defendant is not entitled to relief on this basis.

In addition, Defendant raised at oral argument that Mr. Landis allegedly interviewed the victim a second time after interviewing Defendant and that the victim only discussed Defendant's password-protected secure folder on his cell phone during that second interview. This series of events was not discussed at the Rule 608 hearing, although defense counsel raised it in his memorandum of law in support of his motion for new trial; the motion for new trial itself did not reference the victim's interviews.

Defense counsel acknowledged at the motion for new trial hearing that he had no proof to submit in this regard, although he had requested to have Mr. Landis and the victim subpoenaed to testify about the interviews. The trial court denied Defendant's request to subpoena Mr. Landis and the victim "so that [counsel] can cross-examine them about a speculative thought that [counsel had]." The trial court noted that defense counsel knew about the interviews before trial and could have cross-examined either witness about them during their trial testimony.

Defendant has not included this issue in his appellate brief. We note that the appellate record contains no documentation or evidence related to this claim other than defense counsel's assertions. To the extent that Defendant attempted to raise the issue at oral argument, it has been waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues

---

[8] We note that the hearing transcript was not made part of the record.

presented for review"); Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"); Tenn. R. App. P. 27(a)(4), (7) (stating that the appellant's brief shall contain a statement of the issues presented for review and an argument setting forth "the contentions of the appellant with respect to the issues presented"). Defendant is not entitled to relief on this basis.

## Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE